IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Commonwealth of Pennsylvania, | : | |
| Pennsylvania Game Commission, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 608 C.D. 2018 |
| | : | Submitted: May 8, 2019 |
| State Civil Service Commission | : | |
| (Wheeland), | : | |
| Respondent | : | |

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
HONORABLE RENÉE COHN JUBELIRER, Judge
HONORABLE P. KEVIN BROBSON, Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE ANNE E. COVEY, Judge
HONORABLE MICHAEL H. WOJCIK, Judge
HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION
BY PRESIDENT JUDGE LEAVITT                    FILED: October 18, 2019

The Pennsylvania Game Commission petitions for this Court's review of an adjudication of the State Civil Service Commission ordering the reinstatement of Timothy A. Wheeland to his position as Wildlife Maintenance Propagator. The Game Commission furloughed Wheeland when it closed the pheasant game farm where Wheeland worked as a cost-savings and efficiency measure after receiving a substantial budget cut. The Game Commission contends that the Civil Service Commission erred in holding that the Game Commission's evidence did not make a *prima facie* case that Wheeland's furlough was necessitated by lack of funds and in refusing even to address the Game Commission's evidence that his furlough was also necessitated by a lack of work.

**Background**

On December 12, 2016, the Game Commission notified Wheeland that he would be furloughed as of January 27, 2017, due to a lack of funds. Pursuant to Section 951(a) of the former Civil Service Act,[1] Wheeland appealed to the Civil Service Commission, which held a hearing on May 2, 2017.

The Game Commission called Robert Boyd, the Wildlife Services Division Chief for the Game Commission's Bureau of Wildlife Management, to testify about why the Game Commission closed the North Central Game Farm and furloughed Wheeland and five other pheasant propagators who worked there. The Bureau, *inter alia*, operates a pheasant propagation program that hatches pheasant chicks and raises them at game farms located in different parts of the state. As Division Chief, Boyd is responsible for the pheasant propagation program's finances and budget. Notes of Testimony, 5/2/2017, at 14-15 (N.T. __); Reproduced Record at 65a-66a (R.R. __).

Boyd identified two Game Commission memoranda that were authored by the agency's Executive Director, Robert Hough. Boyd was the recipient of one memorandum and copied on the other. In the first memorandum, Appointing Authority Exhibit 1, Hough wrote to staff on April 7, 2015, that the Game Commission had been instructed by the Governor's Office to reduce "this year's budget by an additional $5.2 million; this is on top of the $14 million we were already required to cut from our budget this winter." Appointing Authority Exhibit

---

[1] Act of August 5, 1941, P.L. 752, *as amended*, added by Section 27 of the Act of August 27, 1963, P.L. 1257 (provides for appeals and hearings), *formerly* 71 P.S. §741.951(a). The Civil Service Act was repealed by the Act of June 28, 2018, P.L. 460, effective March 28, 2019. The subject matter of Section 951 of the former Civil Service Act is now found at 71 Pa. C.S. §§2202 and 3003, as enacted by the Act of June 28, 2018, P.L. 460.

1 (AA-1); R.R. 18a.  The memorandum cited a decline in the Game Commission's revenue from natural gas leases of state game land.  Hough's second memorandum, Appointing Authority Exhibit 2, was addressed to the Governor's Secretary of Administration and notified the Secretary that the Game Commission intended to furlough 13 pheasant propagators, effective January 27, 2017.[2]  Boyd was one of four senior Game Commission staff copied on this communication to the Secretary of Administration.

Boyd testified that the Game Commission was instructed to reduce expenses because its funding had been reduced by 10 percent for fiscal year 2015-2016 and 25 percent for the following year.  Boyd testified that his Bureau implemented these instructions by not filling vacant propagator positions and deferring certain capital improvements.  Most significant was the Bureau's decision to end the pheasant hatchery operations and move to a "chick purchase program." N.T. 19; R.R. 70a.  Boyd explained that in 2015 the Game Commission spent $4.7 million on pheasant propagation; in 2017, this was reduced to $3 million.  Boyd explained that personnel constitutes the largest single expense item in the Bureau's budget for the pheasant propagation program.

---

[2] Hough's memorandum of November 15, 2016, states, in relevant part, as follows:

> It has been determined that it will be necessary to furlough 13 Wildlife Maintenance Propagators from the Western and [North Central] Game Farms.  These positions are covered by a collective bargaining unit [] and these are Civil Service covered positions.  The anticipated date of the furlough is January 27, 2017.  Each game farm is its own seniority unit and all propagators in each unit will be furloughed. The Western Game Farm is furlough unit 008 with 7 propagators and the North Central Game Farm is furlough unit 010 with 6 propagators.

Appointing Authority Exhibit 2 (AA-2); R.R. 21a.

Boyd explained how the decision to furlough Wheeland was made. He stated that because "we didn't get our license fee increase" from the legislature, it was decided to close the game farms to save money. N.T. 21; R.R. 72a. Initially, all four game farms were slated for closure. However, Boyd explained that "it was decided to go ahead and keep the program alive because it does add value[] to the Agency and to our Sportsmen Unlimited." *Id.* Accordingly, the Game Commission decided to keep two farms open, one in each part of the state. He explained how the Bureau chose the farms to be closed:

> Q. And how did you pick which farms would be closed?
>
> A. Well, it was a very difficult decision, but we divided the state into two halves, the eastern half and the western half. In the west, it---if you're looking at farms that would be in the central part of that area[,] the Southwest Game Farm was sort of an easy winner over the Western Game Farm.
>
> In the eastern part of the state, the Loyalsock and [North Central] Game Farms are both very close together. So really the deciding factor there was the fact that Loyalsock Game Farm had a breeder flock. [It] no longer had the breeder flock, so [it] had open pens that we could use for increased holding capacity for birds released in the fall for sportsmen.
>
> The [North Central] Game Farm did not have a breeder flock previously and did not have those empty pens available.
>
> Q. Mr. Boyd, is it necessary to have additional Wildlife Maintenance Propagators in order to raise the chicks at the remaining farms?
>
> A. No. We're --- we're planning to make do with the existing staff at the Southwest and Loyalsock Game Farms.

N.T. 21-23; R.R. 72a-74a.

4

Wheeland, who was *pro se*, then questioned Boyd. Wheeland, who lives close to the North Central Game Farm where he had worked prior to the farm's closure, informed Boyd that "on a pretty regular basis" he saw employees maintaining the grounds. N.T. 24; R.R. 75a. When asked about these employees, Boyd responded that staff from the two remaining game farms worked at the North Central Game Farm as needed, leaving "no unmet needs in terms of manpower." N.T. 25; R.R. 76a. Wheeland then stated that when the Game Commission first considered buying chicks, he and other propagators were told they would not be furloughed. In response, Boyd explained as follows:

> By buying chicks, we're saving money and improving our efficiency. But there were no plans to furlough anybody. If we were able to go through with four farms and buy chicks, we were going to go with full force. *It's only not getting the license fee increase that caused this level of crisis to escalate to the point we had to close two farms because of the lack of revenue to the [Game Commission].*

N.T. 26; R.R. 77a (emphasis added). In short, it was the "lack of revenue" from anticipated license fee increases that required the closure of two game farms.

Wheeland questioned Boyd about the Game Commission's decision to hire 35 new Wildlife Conservation Officer Cadets contemporaneously with the furloughs. Wheeland presented a job description for a "Wildlife Conservation Officer Cadet." Appellant Exhibit 1; R.R. 48a. He also presented an email he received from the district office of Pennsylvania State Representative Garth Everett. Appellant Exhibit 2; R.R. 50a. Representative Everett's email to Wheeland estimated that hiring 35 new Wildlife Conservation Officer Cadets would cost approximately $2 million.

5

Wheeland asked Boyd how the Game Commission could afford to hire the cadets while also finding it necessary to furlough propagators. Boyd replied, "[j]ust understand that I'm in charge of the Pheasant Propagation Program. I don't work at the higher level where these decisions are being made about what gets cut…." N.T. 31; R.R. 82a. Wheeland then asked, "I'm sure you're aware of all this, though. Correct?" *Id.* Boyd responded in the affirmative. Wheeland asked Boyd why, in defending the pheasant propagation program against furloughs, Boyd did not object to the cadet hirings. Boyd responded, "Maybe I did." N.T. 32; R.R. 83a.

Wheeland was sworn and then presented his case. Wheeland opined that the propagators should have been employed until the end of the fiscal year "seeing as how the budget was already in place. There was money there to pay to [the propagators]. There was still work to be done." N.T. 42; R.R. 93a. Wheeland testified that, during the winter, propagators do maintenance on machinery at the farms. He stated that he and the other propagators could have done maintenance at the North Central Game Farm instead of "pushing it to one of the other two farms and you know, making them maintain it." N.T. 45; R.R. 96a.

The Game Commission objected to the admission of Wheeland's exhibits, Appellant Exhibits 1 and 2, as irrelevant. The Commissioner conducting the hearing stated, "I'm going to go ahead and admit [them] for the record…. [W]e will give those the weight they deserve during our adjudication of this matter. But I don't see any reason to keep them out of the record." N.T. 36; R.R. 87a. He also stated that "[o]ne thing that is not going to come out of our decision in this matter is we're not going to second-guess the [Game] Commission and the Executive Director's decision as to priority functions." *Id.*

6

The Game Commission moved to admit both Appointing Authority Exhibits 1 and 2, and Wheeland did not object. The Commissioner stated:

> So, AA-1, the two Appointing Authority exhibits, AA-1 and AA-2 will be admitted into the record without objection.
>
> And likewise, I do think that they provide a little more detail of the budget situation that the [Game Commission] was facing at the time of the furlough. So I think they're going to be given just not equal weight, probably a little more weight.

N.T. 38; R.R. 89a.

## Adjudication

The Civil Service Commission sustained Wheeland's appeal. The Civil Service Commission found that the Game Commission's admitted exhibits "AA-1 and AA-2" were hearsay and not entitled to probative value. It further found that Boyd's testimony did not corroborate the Game Commission's admitted exhibits, reasoning that Boyd did not have personal knowledge of the relationship between the Game Commission's funding and Wheeland's furlough.

In its adjudication, the Civil Service Commission made the following conclusion of law:

> The appointing authority has failed to present evidence establishing a lack of funds sufficient to justify furlough under Section 802 of the Civil Service Act, as amended.

Civil Service Commission Adjudication at 17. Based on this conclusion, it ordered the Game Commission to expunge the furlough from Wheeland's record, return Wheeland to regular employment as a Wildlife Maintenance Propagator within 30 days and reimburse Wheeland for all wages and emoluments due since January 27, 2017, less wages and benefits received.

7

**Appeal**

On May 1, 2018, the Game Commission petitioned for this Court's review,[3] and it makes three arguments on appeal. First, it argues that the Civil Service Commission erred in holding that the Game Commission did not present a *prima facie* case that lack of funds caused Wheeland's furlough. Second, it argues that the Civil Service Commission erred in refusing to address the Game Commission's evidence that lack of work caused Wheeland's furlough. Third, it argues that in reaching its conclusion, the Civil Service Commission improperly considered the Game Commission's decision to hire additional law enforcement personnel.[4]

**I.**

We begin with a review of the law relevant to the furlough of employees protected by the Civil Service Act. Our Supreme Court has explained as follows:

> A "furlough" is defined by Section 3(s) of the Civil Service Act . . . as a "termination of employment because of lack of funds or of work." When there has been called into question the validity of a furlough, the appointing authority has the burden of going forward with proof to establish a prima facie case justifying the furlough, viz, that the furlough resulted from a lack of funds or a lack of work. 4 Pa. Code §105.15.[5]

---

[3] This Court's review of a Civil Service Commission adjudication is limited to determining whether necessary findings of fact are supported by substantial evidence, whether an error of law has been committed or whether constitutional rights have been violated. *Pennsylvania Game Commission v. State Civil Service Commission (Toth)*, 747 A.2d 887, 891 (Pa. 2000).

[4] On August 23, 2018, because Wheeland did not file a brief in accordance with the briefing schedule, this Court entered an order extending the brief's deadline to September 5, 2018. The order further stated that failure to file a brief in accordance with the extended deadline would bar his participation in this appeal. Wheeland responded by email that he would not file a brief.

[5] The Civil Service Commission's regulation states as follows:

8

*Department of State v. Stecher*, 484 A.2d 755, 757 (Pa. 1984). A lack of funds "exists when insufficient revenue is available to meet all financial demands unless modifications are made in the system." *Forbes v. Department of Transportation*, 434 A.2d 892, 894 n.4 (Pa. Cmwlth. 1981). To establish a *prima facie* case on lack of funds, the appointing authority must present "specific evidence of the need for financial cuts which would justify the furlough." *Beaver County v. Funk*, 492 A.2d 118, 121 (Pa. Cmwlth. 1985).

To show a lack of funds, the Game Commission offered several pieces of evidence. It offered two contemporaneous memoranda authored by the Game Commission's Executive Director. One memorandum was sent to Game Commission staff, and the other was sent to the Governor's Office. The Commissioner conducting the hearing observed that the two memoranda "provide a little more detail on the budget situation that the Game Commission was facing at the time of the furlough" and would be given "a little more weight." N.T. 38; R.R. 89a. In its adjudication, however, the Civil Service Commission did a *volte face* on these admitted memoranda, concluding that they were not entitled to any weight because they were hearsay.

The Game Commission also offered the testimony of Boyd. The Civil Service Commission did not find Boyd's testimony incompetent or incredible; rather, it concluded that Boyd had not been sufficiently specific.

---

(a) The appointing authority shall go forward to establish the charge or charges on which the personnel action was based. If, at the conclusion of its presentation, the appointing authority has, in the opinion of the Commission, established a prima facie case, the employee shall then be afforded the opportunity of presenting his case.

4 Pa. Code §105.15(a).

9

In so holding, the Civil Service Commission relied upon *Beaver County*, 492 A.2d 118, where the county furloughed an employee for lack of funds. The county's witness testified that the county had made a policy decision to cut personnel costs, but his testimony did not connect this policy decision to a lack of funds. At best, the county's witness made "general statements about the County's 1982 deficit." *Id*. at 121. It did not present "specific evidence of the need for financial cuts which would justify the furlough." *Id*.

*Beaver County* is distinguishable because the Game Commission presented "specific evidence of the need for financial cuts." *Id*. Boyd testified that the legislature's decision not to adopt a pheasant hunting license (and the attendant license fee) or to raise the existing fees for hunting licenses created a "crisis" that required the Game Commission "to close two farms." N.T. 26; R.R. 77a. Boyd explained that this fee revenue was needed because of declining revenue from natural gas leases. Further, Boyd identified the actual savings realized by the reduction in the pheasant propagation program, for which he had budget responsibility. The 2015-2016 budgeted expense of $4.7 million for the pheasant propagation program was reduced to $3 million in 2017. In sum, Boyd provided detail on loss of funding that had been absent from the county's testimony in *Beaver County*.

In addition, Hough's April 2015 memorandum to Game Commission staff projected a $35 million deficit by 2019 if reductions in expenditures were not made. Exhibit AA-1; R.R. 18a. Thus, the Game Commission's evidence showed insufficient revenue "to meet all financial demands unless modifications are made in the system." *Forbes*, 434 A.2d at 894 n.4.

10

The Civil Service Commission's decision to reject the Game Commission's evidentiary case on lack of funds cannot be reconciled with this Court's holding in *Forbes*, 434 A.2d 892. In *Forbes*, this Court considered the furlough of an employee of the Department of Transportation for lack of funds. To support its furlough, the Department presented a memorandum authored by the Secretary of Transportation, which the employee challenged as insufficiently specific. This Court rejected this argument, citing the testimony of the Deputy Secretary of Highway Administration about the memorandum:

> The witness indicated that, upon learning that the Legislature had not provided as much revenue as [the Department] needed to maintain its funding level, *the Secretary sent a memorandum to the appropriate staff persons alerting them to which programs had been cancelled, or curtailed*, *and directing them to make modifications* in their personnel requirements to reflect the budget reorganization.

*Id.* at 894 (internal footnote omitted) (emphasis added). This Court concluded that the Deputy Secretary's testimony together with a copy of the Secretary's internal memorandum describing the Department's fiscal challenges constituted substantial evidence that a lack of funds caused the employee's furlough.

Likewise, here, the Game Commission presented a memorandum of its agency head, Robert Hough, about the Game Commission's revenue reductions and projected deficit, as well as the testimony of "an appropriate staff person," *i.e.,* Boyd. *Id.* Boyd received Hough's memorandum "alerting" Game Commission staff of the curtailed budget and "directing them to make modifications in their personnel requirements." *Id.* Boyd's knowledge about the funding cuts from the Game Commission was even acknowledged at the hearing by Wheeland, who stated, while

11

referring to the pheasant propagation program cuts, "I'm sure you're aware of all this, though." N.T. 31; R.R. 82a. Wheeland acknowledged Boyd's presence at the Game Commission meetings where the furlough decisions were made, even chastising Boyd for not doing a better job of defending the pheasant propagation program.

After admitting Executive Director Hough's memoranda, one internal to the Game Commission and the other a communication to the Governor's Office, the Civil Service Commission refused to consider them for the stated reason that they constituted hearsay. This was error. Assuming, *arguendo*, that the two memoranda were hearsay, they were entitled to be given probative value under *Walker v. Unemployment Compensation Board of Review*, 367 A.2d 366 (Pa. Cmwlth. 1976).

The so-called *Walker* rule provides that a fact-finder may give hearsay evidence admitted without objection its natural probative effect so long as it is corroborated by competent evidence of record. *Id.* at 370. The Game Commission's file memoranda were admitted into the record without objection and entitled to probative effect because they were corroborated by Boyd, who received both memoranda.

Boyd demonstrated his personal knowledge of the Game Commission's funding shortage. The problem began with a decline in the agency's natural gas revenue. In response, Boyd testified that his Bureau cut spending by deferring capital improvements and not filling vacancies. Boyd explained, however, that the Game Commission needed a pheasant hunting license or increased hunting license fees to sustain operations. When that did not occur, a "crisis" developed for the

12

pheasant propagation program, for which personnel was the largest single expense item. This required the closure of the North Central Game Farm where Wheeland worked. Boyd testified specifically about his direct involvement in the decision to close two game farms and furlough Wheeland and others.[6] Boyd's personal knowledge of the Game Commission's revenue challenges, *i.e.*, "loss of funds," was demonstrated throughout his testimony and was acknowledged even by Wheeland.

Boyd's testimony constituted competent evidence that corroborated both memoranda. This allowed the Civil Service Commission to make findings of fact on the basis of both of Hough's memoranda. Even so, the Civil Service Commission erred in making the assumption that these memoranda constituted inadmissible hearsay. The word "hearsay" was not spoken at the hearing, either during testimony or in closing argument. The Commissioner conducting the hearing informed the parties that the Game Commission memoranda were admitted without qualification and that they would be given "more weight." N.T. 38; R.R. 89a.

Administrative hearings are not subject to the finer points of the rules of evidence that govern judicial hearings. *In re S.H.*, 96 A.3d 448, 461 (Pa. Cmwlth. 2014) ("The rules of evidence are relaxed in administrative proceedings."). Nevertheless, they are subject to due process requirements. *School District of Philadelphia v. Pennsylvania Milk Marketing Board*, 683 A.2d 972, 978 (Pa. Cmwlth. 1996). Under *Lyness v. State Board of Medicine*, 605 A.2d 1204 (Pa. 1992), an administrative agency must separate its adjudicatory function from its

---

[6] In its adjudication, the Civil Service Commission stated that Boyd did not establish his role in these decisions. Civil Service Commission Adjudication at 14. This is directly contradicted by Boyd's testimony as noted above. Indeed, Boyd's participation was acknowledged by Wheeland. N.T. 31, R.R. 82a.

13

prosecutorial function. Here, the Civil Service Commission took on the role of prosecutor by *sua sponte* raising, and deciding, that the Game Commission's memoranda constituted inadmissible hearsay that was not corroborated by Boyd's testimony. This was Wheeland's job. The Civil Service Commission, at a minimum, should have requested briefs on this hearsay question before doing a *volte face* in the adjudication on Hough's memoranda that had been admitted with the express assurance that they would be given probative weight.

Moreover, the Civil Service Commission erred in assuming that the memoranda constituted hearsay. The Commonwealth of Pennsylvania conducts business through the exchange of memoranda, as does every public and private organization. Had the Game Commission been aware of the Civil Service Commission's concern about the admissibility of two memoranda from Boyd's files, it could have responded, *inter alia*, by showing that the memoranda met the business records or public records exception to the hearsay rule. *See* PA. R.E. 803(6), 803(8).[7]

_____

[7] Rule 803(6) and 803(8) of the Pennsylvania Rules of Evidence establish the business records and public records exceptions to the hearsay rule, stating:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> > **(6) Records of a Regularly Conducted Activity.** A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if:
> >
> > (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;
> >
> > (B) the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;
> >
> > (C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

* * *

**(8) Public Records.** A record of a public office if:

(A) the record describes the facts of the action taken or matter observed;

(B) the recording of this action or matter observed was an official public duty; and

(C) the opponent does not show that the source of the information or other circumstances indicate a lack of trustworthiness.

PA. R.E. 803(6), (8).

The business records exception does not require the presence of the document's actual preparer, only the testimony of a qualifying witness. *In re Indyk's Estate*, 413 A.2d 371, 373-74 (Pa. 1979). Testimony on the preparation and maintenance of the records is sufficient to justify the presumption of trustworthiness for the business records exception, and provides a sufficient basis to offset the hearsay character of the evidence. *R.A. Freudig Associates v. Insurance Department*, 532 A.2d 509, 512 (Pa. Cmwlth. 1987) (citing *Indyk's Estate*, 413 A.2d 371). In *Fauceglia v. Harry*, 185 A.2d 598, 600 (Pa. 1962), the Supreme Court explained that "as long as someone in the organization has personally observed the event recorded, the evidence should be admitted."

Likewise, for a document to be admissible under the public records exception, the testimony must show that the document was prepared pursuant to an official duty. *Commonwealth v. Slider*, 323 A.2d 376, 377 (Pa. Super. 1974). The official duty can arise from the oral or casual directions of a superior or from functions inherent in the office, rather than arising from an express statute or regulation. *Commonwealth v. Sabb*, 409 A.2d 437, 442 (Pa. Super. 1979). Public records enjoy a presumption of trustworthiness, requiring the opposing party to establish a lack of trustworthiness. *D'Alessandro v. Pennsylvania State Police*, 937 A.2d 404, 414 (Pa. 2007). Rule 803(8) does not impose a personal knowledge requirement as does Rule 803(6). In any case, personal knowledge may be inferred where the reports were prepared in the ordinary course of the agency's duty. *Fauceglia*, 185 A.2d at 601.

Here, Hough's two memoranda came from Boyd's files, and he "personally observed the event recorded." *Id.* at 600. Boyd participated in the decision to close the North Central Game Farm where Wheeland worked. The Game Commission argues that Hough's memoranda are business records and public records that meet the requirements of Pennsylvania Rules of Evidence 803(6) and (8). The Game Commission makes a strong case, but we need not address this issue because it was not the basis of the Civil Service Commission's adjudication.

15

Business records and public records, duly admitted, are entitled to be given probative weight.

The Civil Service Commission erred. There was no basis in the record for its assumption that Executive Director Hough's memoranda constituted inadmissible hearsay. However, even if they had constituted unobjected-to hearsay, they were fully corroborated by Boyd, the Game Commission's Wildlife Services Division Chief. Boyd testified, without contradiction, from his own knowledge about the cause of the Game Commission's lack of funds: a decline in natural gas revenue followed by the General Assembly's refusal to approve a pheasant hunting license or an increase in hunting license fees. The intra-agency and inter-agency memoranda admitted into evidence also demonstrated that lack of funds required the Game Commission's Bureau of Wildlife Management to reduce costs. It did so. The pheasant propagation program was not eliminated but drastically reduced, which resulted in a savings of $1.7 million in 2017.

## II.

The Game Commission next argues that the Civil Service Commission erred by refusing to address the alternative grounds for Wheeland's furlough, *i.e.*, lack of work.[8] We agree.

The Civil Service Commission's regulation states that "[f]urloughs shall occur only because of lack of funds *or* lack of work." 4 Pa. Code §101.1(a)

---

[8] The notice sent to Wheeland stated that he was furloughed for a lack of funds; however, a furlough notice need not state the reason for the furlough. 4 Pa. Code §§105.2, 105.3; *see McAndrew v. State Civil Service Commission (Department of Community and Economic Development)*, 736 A.2d 26, 29-30 (Pa. Cmwlth. 1999) ("[B]ecause there can only be two reasons for a furlough, an employee is on notice that he or she is being furloughed due to lack of funds or work.").

16

(emphasis added). To establish a lack of work, the appointing authority must establish that: (1) the employee's position was eliminated; (2) reorganizational streamlining occurred; and (3) management in good faith believed that work could be accomplished more efficiently in the absence of the eliminated position. *Stecher*, 484 A.2d at 759. A furlough based upon a lack of work is proper when "the amount of work the employee is performing does not warrant his retention in view of the fact that the employee's work can more efficiently, from a cost or operational standpoint, be performed through reassignment to others…." *Id.* at 758. *See also Haskins v. Department of Environmental Resources*, 636 A.2d 1228, 1229 (Pa. Cmwlth. 1994) (lack of work occurs when an agency contracts out services previously performed by the furloughed employee to enhance efficiency or secure cost savings).[9]

In *Department of Public Welfare v. Magrath*, 321 A.2d 403 (Pa. Cmwlth. 1974), the director of a state hospital determined that non-staff surgeons could perform surgeries on a fee-for-service basis, thereby saving the hospital money and improving efficiency. Accordingly, the director furloughed a staff surgeon who had performed the required surgeries. This Court held that because the staff surgeon's work was transferred to a non-staff surgeon, the appointing authority demonstrated a lack of work.

---

[9] Notably, Section 802(a) of the former Civil Service Act governed the manner by which furloughs are implemented, but it did not limit the reasons that may make "a reduction in force [ ] necessary." *Formerly* 71 P.S. §741.802(a), repealed by the Act of June 28, 2018, P.L. 460, effective March 28, 2019. The statute places no burden upon the appointing authority to prove necessity. The adjudication of the Civil Service Commission held that the Game Commission violated Section 802 of the Civil Service Act, without specifying the subsection. Civil Service Commission Adjudication at 17.

17

In *Silverman v. Department of Education*, 454 A.2d 185 (Pa. Cmwlth. 1982), this Court cautioned that lack of work is not demonstrated simply by eliminating a position. Where the work in the eliminated position has been reassigned from the furloughed employee to another employee, this suggests that there is not a lack of work. Stated otherwise, the appointing authority cannot use subterfuge to avoid the rules in the Civil Service Act by furloughing an employee whose work has been shifted to another employee. This Court elaborated upon *Silverman* in *O'Byrne v. Department of Transportation*, 498 A.2d 1385 (Pa. Cmwlth. 1985). We explained that even where the work of the eliminated position is transferred to other employees, the appointing authority can demonstrate a lack of work where the transfer of work has been done to "streamline internal procedures and to promote efficiency." *Id.* at 1388.

Wheeland worked as a propagator at the North Central Game Farm. In his appeal he sought to "maintain employment with the Commonwealth." R.R. 6a. His appeal described his furlough as "unjustified" but did not state why. *Id.* Wheeland objected to the closing of the game farm where he worked for the stated reason that the Game Commission contemporaneously hired new wildlife conservation officers. He also stated, "I feel that we should have been --- kept [at] the farm until the end of the --- until the end of the fiscal year." N.T. 42; R.R. 93a. Wheeland did not rebut any of the Game Commission's evidence about the decision to close the North Central farm after it decided to purchase pheasant chicks in lieu of hatching them from eggs.

As Boyd fully explained, the Bureau of Wildlife Management has stopped breeding pheasants and, instead, is buying day-old chicks from a private

18

vendor. The Game Commission closed the North Central and Western Game Farms because they lacked the pen capacity to handle the purchased chicks. The Game Commission did not transfer Wheeland's work as a propagator to other employees.

Consistent with *Magrath* and *Silverman*, the Game Commission offered *prima facie* evidence that Wheeland's furlough was necessitated by lack of work. The Game Commission eliminated Wheeland's position, not as a subterfuge to avoid the furlough procedures of the Civil Service Act but, rather, to streamline its pheasant breeding operations to reduce expenses and improve efficiency. The Civil Service Commission erred in refusing even to address the Game Commission's evidence on lack of work.

## III.

Finally, we address the Game Commission's argument that the Civil Service Commission erred and abused its discretion by considering irrelevant evidence, *i.e.*, that the Game Commission was hiring personnel in another division while it furloughed Wheeland. In its adjudication, the Civil Service Commission made reference to the Game Commission's decision to hire 35 Wildlife Conservation Officer Cadets one week after Wheeland's furlough. Civil Service Commission Adjudication at 12.[10] However, the Civil Service Commission did not

---

[10] In this regard, the Game Commission relied upon Wheeland's exhibits, to which the Game Commission objected. The Commissioner conducting the hearing acknowledged that the decision on what program to curtail and what program to grow belongs exclusively to the appointing authority, stating that "we're not going to second-guess … the Executive Director's decision as to priority functions." N.T. 36; R.R. 87a. It may well be that the game wardens generate revenue through enforcement initiatives that substantially offsets the expense of their salaries.

19

base its adjudication on the fact of these new hires. The Civil Service Commission's discussion was, at most, harmless and irrelevant.[11]

**Conclusion**

For all of the foregoing reasons, we vacate the adjudication of the Civil Service Commission and remand this matter for further proceedings. On remand, the Civil Service Commission must give probative weight to the testimonial and admitted documentary evidence that the Game Commission offered to show a lack of funds and must address Boyd's testimony that Wheeland's furlough was necessitated by a lack of work when the Bureau of Wildlife Management stopped breeding pheasants and closed two game farms.

_____
MARY HANNAH LEAVITT, President Judge

---

[11] The appointing authority determines what work is necessary to be performed and how that work can be performed most efficiently. *Haskins*, 636 A.2d at 1230. It is not this Court's prerogative to second guess these decisions. *Id.* Likewise, the Civil Service Commission lacks this prerogative.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Commonwealth of Pennsylvania, :
Pennsylvania Game Commission, :
          Petitioner :
           :
          v. : No. 608 C.D. 2018
           :
State Civil Service Commission :
(Wheeland), :
          Respondent :

# **O R D E R**

AND NOW, this 18th day of October, 2019, the order of the State Civil Service Commission dated April 5, 2018, is VACATED and this matter is REMANDED for proceedings consistent with the attached opinion.

Jurisdiction relinquished.


_____
MARY HANNAH LEAVITT, President Judge

Commonwealth of Pennsylvania, :
Pennsylvania Game Commission, :
                Petitioner :
                 :
            v. :
                 :
State Civil Service Commission :
(Wheeland), : No. 608 C.D. 2018
             Respondent : Submitted: May 8, 2019

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
               HONORABLE RENÉE COHN JUBELIRER, Judge
               HONORABLE P. KEVIN BROBSON, Judge
               HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE ANNE E. COVEY, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge

DISSENTING OPINION
BY JUDGE COVEY                         FILED: October 18, 2019

       I respectfully dissent from the Majority's conclusion that the State Civil Service Commission (SCSC) erred by holding that the Commonwealth of Pennsylvania, Pennsylvania Game Commission's (Game Commission) evidence did not make a *prima facie* case that Timothy A. Wheeland's (Wheeland) furlough was necessitated by lack of funds and in refusing to address the Game Commission's evidence that his furlough was also necessitated by a lack of work. Because the Game Commission's Executive Director Robert M. Hough's (Hough) April 7, 2015 Strategic Plan/Budget memorandum (Game Commission Memo), and the November 15, 2016 Furlough Notification letter from the Game Commission's Administration Office's Secretary Sharon Minnich (Minnich) to Hough (Furlough Notification Letter) were uncorroborated hearsay evidence and the Game Commission's Wildlife

Management Bureau's Wildlife Services Division Chief Robert Boyd (Boyd) did not testify with respect to the budgets, the Game Commission did not meet its burden of proving that Wheeland's furlough was necessitated by a lack of funds and/or a lack of work. Accordingly, I would affirm the SCSC's order reinstating Wheeland to his position as Wildlife Maintenance Propagator.

The issue before the Court is not whether Wheeland's furlough was in fact necessitated by lack of funds or lack of work, but rather, whether the Game Commission met its burden of proving said lack of funds or lack of work. Because the Game Commission was required to make a *prima facie* showing of lack of funds, and rather than presenting sufficient evidence, it offered two hearsay documents and Boyd, who did not lay a foundation for the Game Commission Memo and Furlough Notification Letter's admission, nor testify from first-hand knowledge regarding the Game Commission's budget, the Game Commission failed to meet its burden.

Initially, the Pennsylvania Supreme Court has clarified: "As commonly understood, *prima facie* evidence is '[s]uch evidence as, in the judgment of the law, is **sufficient to establish a given fact, or the group or chain of facts constituting the party's claim** or defense, and which if not rebutted or contradicted, will remain sufficient.' *Black's Law Dictionary* 825 (6th ed. abridged 1991)." *In re L.Z.*, 111 A.3d 1164, 1185 (Pa. 2015) (emphasis added). By way of example as to what evidence establishes a *prima facie* case, although in the context of a criminal case, our Supreme Court explained:

> A *prima facie* case exists when the Commonwealth produces evidence of each of the material elements of the crime charged and establishes sufficient probable cause to warrant the belief that the accused committed the offense. The evidence need only be such that, if presented at trial and accepted as true, the judge would be warranted in permitting the case to go to the jury.

*Commonwealth v. Hoggans*, 836 A.2d 862, 866 (Pa. 2009).

In order to make out a *prima facie* case of lack of funds, the appointing authority must present "**specific evidence** of the need for financial cuts which would justify the furlough." *Beaver County v. Funk*, 492 A.2d 118, 121 (Pa. Cmwlth. 1985) (emphasis added). The Majority maintains that this case is distinguishable from *Funk* because "Boyd provided detail on loss of funding that had been absent from the county's testimony in *Beaver County*." Majority Op. at 10. However, Boyd merely repeated what was in the Game Commission Memo and the Furlough Notification Letter to support the Game Commission's alleged lack of funding justification. As stated by the SCSC, "[t]aken as a whole, Boyd's testimony indicates a decision was made by the appointing authority to close two game farms, Boyd was directed to close two of those farms, and that someone made the decision that Northcentral Game Farm would be one of the two that were closed." SCSC Adjudication at 14.

Importantly, Boyd had no "personal knowledge of the relationship between the available funding and the furloughs that were conducted." *Id.*; *see Mazurkiewicz v. State Civil Serv. Comm'n (Dep't of Gen. Servs.)* (Pa. Cmwlth. No. 975 C.D. 2013, filed December 20, 2013),[1] (wherein, the SCSC affirmed the Department of General Services' lack of funding furlough, opining, *inter alia*, "[t]he Deputy Secretary 'testified **from first-hand knowledge** that using in-house surveyors would cost nearly three times as much as contracting out all surveyor work[, and] that elimination of the in-house surveyor unit, and contracting out surveyor work, constituted a more cost-effective means of providing [] core services.'" *Id.*, slip op. at 10-11 (emphasis added)).

---

[1] Pursuant to Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a), this unreported opinion is not binding precedent, but is cited only as an example of what this Court previously highlighted as sufficient *prima facie* lack of funding evidence.

The Majority cites *Forbes v. Department of Transportation (PennDOT)*, 434 A.2d 892 (Pa. Cmwlth. 1981), to support its position that the Game Commission presented sufficient *prima facie* evidence to justify a lack of funds furlough. Specifically, the Majority maintains that the same evidence is relied upon therein as was offered here. However, in *Forbes*, the **Deputy Secretary** of Highway Administration testified from personal knowledge that "upon learning that the Legislature had not provided as much revenue as PennDOT needed to maintain its funding level, the **Secretary** sent a memorandum to the appropriate staff persons alerting them to which programs had been cancelled, or curtailed, and directing them to make modifications in their personnel requirements to reflect the budget reorganization." *Id.* at 894 (emphasis added; footnote admitted).

Here, Boyd merely testified that he "received a copy of [the Game Commission Memo,]" Reproduced Record (R.R.) at 67a, and although he was carbon copied on the Furlough Notification Letter, Boyd identified it without giving any explanation with respect to its issuance or his receipt thereof. *See* R.R. at 71a. Moreover, Boyd did not lay a foundation for either document's admittance into evidence, but simply repeated what was contained therein.[2]

Further, the fact that the *Forbes* opinion only refers to a memorandum and the Deputy Secretary's testimony, does not mean that was the only evidence admitted. A review of the records in this Court's more recent lack of funding cases reveals that they all included **sufficient, reliable evidence and credible testimony** explaining the funding and the reasons for the decisions made. *See Kolega v. State Civil Serv. Comm'n* (Pa. Cmwlth. No. 2056 C.D. 2015, filed October 15, 2015), 2015 WL 6473264 (The Bureau of Teaching and Learning's Director, the Director of

---

[2] The admissibility of the memorandum in *Forbes* was not at issue, so the opinion does not state what, if any, foundation was laid for the admittance of the memorandum therein.

Human Resources, the Office of Administration's Director of Labor Relations, and a budget analyst in the Department's Bureau of Budget and Fiscal Management testified. The evidence therein described the federal funding that paid for the furloughed employee's position in 2010 and the government operations fund that paid for the position in 2011.); *Carney v. Pa. State Sys. of Higher Educ.* (Pa. Cmwlth. No. 1177 C.D. 2013, filed August 14, 2014), 2014 WL 3954072 (The Vice President for Finance and Administrative Affairs, the Director of Facility Services and the Assistant Vice President for Human Resources testified. The evidence therein described the budget shortfalls beginning in 2009, the fiscal year running from July 1, 2010 to June 30, 2011, and the projected budget shortage for fiscal year 2011-2012, all of which justified the lack of funding to furlough employee on June 20, 2011.); *Mazurkiewicz* (The Deputy Secretary for Administration, and the Deputy Secretary for Public Works testified. The exhibits therein included, *inter alia*, lists of detailed expenditures and amounts, and lists of specific salaries, as well as exact costs for health care, showing the Deputy Secretary's calculations and cost comparisons.); *Pavia v. Dep't of Transp.*, 466 A.2d 735 (Pa. Cmwlth. 1983) (The Deputy Secretary for Highway Administration, and the Executive Assistant to the Secretary testified. The Secretary's memoranda was also admitted into evidence.). The evidence introduced in the aforementioned cases is in stark contrast to what was presented in the instant case, and clearly illustrates the deficiency in the Game Commission's evidence and consequently its failure to establish a *prima facie* case herein.

Next, the Majority declares that the SCSC erred by *sua sponte* determining the Game Commission Memo and Furlough Notification Letter were inadmissible hearsay after admitting the documents into evidence. The Majority states, "[h]ad the Game Commission been aware" there was a concern, "it could have responded." Majority Op. at 14. However, before the taking of testimony,

Commissioner Gregory M. Lane (Commissioner)[3] stated: "My two colleagues [and I] will be deciding this matter based upon the transcript that's produced here today." R.R. at 63a. In addition, upon admission of Wheeland's documents, the Commissioner explained: "I'm going to go ahead and admit [sic] for the record. My colleagues and I understand the circumstances. And what I'll do is **we will give those the weight they deserve during our adjudication of this matter**." R.R. at 87a (emphasis added). Moreover, after admitting the Game Commission Memo and the Furlough Notification Letter, the Commissioner again explained:

> But that will be most [sic] --- **amongst my colleagues and I to decide** how we're going to look at the facts and the situation and where the budget constraints really lie and where they came from, were they self-generated, et cetera, but --- because our ultimate decision is whether the furloughs were for proper reasons, being lack of funds or lack of work.

R.R. at 89a-90a (emphasis added). The Game Commission was well aware that the entire transcript and all the exhibits would be weighed by all three Commissioners. It is not the duty of the Commissioner to tell the Game Commission how to present its case or instruct it to lay a proper foundation for the admission of its documents.

Notwithstanding, it is axiomatic that "[h]earsay evidence, [a]dmitted without objection, will be given its natural probative effect and may support a finding of the [SCSC], [i]f it is corroborated by any competent evidence in the record, but **a finding of fact based [s]olely on hearsay will not stand**." *Walker v. Unemployment Comp. Bd. of Review*, 367 A.2d 366, 370 (Pa. Cmwlth. 1976) (emphasis added).

---

[3] Although Commissioner Lane heard the appeal, the matter was decided by Commissioner Lane, Commissioner Bryan R. Lentz and Commissioner Odelfa Smith Preston based on the transcript. "Due process is satisfied if a hearing is held before one Commissioner, with the other members subsequently reviewing the testimony before preparing their adjudication." *Hetman v. State Civil Serv. Comm'n (Berks Cty. Children & Youth)*, 714 A.2d 532, 537 (Pa. Cmwlth. 1988).

"The Hearsay Rule is not a technical rule of evidence but a basic, vital and fundamental rule of law which out [sic] to be followed by administrative agencies at those points in their hearings when facts crucial to the issue are sought to be placed upon the record." *Bleilevens v. State Civil Serv. Comm'n*, 312 A.2d 109, 111 (Pa. Cmwlth. 1973). "Indeed, an adjudication of an administrative agency may not be founded wholly on hearsay evidence[.]" *Id.* Accordingly, in order to make its findings, and ultimate ruling, the SCSC had to determine whether the Game Commission Memo and the Furlough Notification Letter were hearsay, and if so, whether there existed any competent evidence to corroborate the hearsay evidence. Because the SCSC found that the Game Commission Memo and Furlough Notification Letter were hearsay, and "the record is lacking any such corroborative evidence[,]" SCSC Adjudication at 15, as a matter of law the Game Commission Memo and Furlough Notification Letter could not support a finding that Wheeland's furlough was in fact necessitated by lack of funds.

The Majority further opines that the documents should have been admitted under the business records and public records exceptions to the hearsay rule.

Pennsylvania Rule of Evidence (Rule) 803(6) provides:

**Records of a Regularly Conducted Activity**. A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition **if**:

(A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a 'business', which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;

(C) making the record was a regular practice of that activity;

(D) **all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies** with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(6) (text emphasis added). Rule 803(8) provides:

**Public Records**. A record of a public office if:

(A) the record describes the facts of the action taken or matter observed;

(B) the recording of this action or matter observed was an **official public duty**; and

(C) the opponent does not show that the source of the information or other circumstances indicate a lack of trustworthiness.

*Comment:* Pa.R.E. 803(8) differs from [Federal Rule of Evidence] 803(8) insofar as it reflects the hearsay exception for public records provided in [Section 6104 of the Judicial Code,] 42 Pa.C.S. § 6104. *See* Rules 901(b)(7) [(relating to authenticating public records)], 902(1)-(4) [(relating to self-authenticating documents)] and [Sections 5328, 6103 and 6106 of the Judicial Code,] 42 Pa.C.S. §§ 5328 [(relating to proof of official records)], 6103 [(relating to proof of official records)], and 6106 [(relating to certified exemplifications of records)] for authentication of public records.

Pa.R.E. 803(8) (text emphasis added).

With respect to the admissibility of the Game Commission Memo, Boyd testified:

A. Yes. This is a memo from [] Hough, our Executive Director at the time, dated April 7th, 2015, about two years ago, regarding a strategic plan and budget situation of the Game Commission that was sent to all Game Commission staff.

BY ATTORNEY MARTSON:

Q. And you received a copy of that memorandum?

A. Yes.

R.R. at 67a. Similarly, relative to the foundation for the Furlough Notification Letter, Boyd only declared:

Q. [] Boyd, I'm presenting you with an exhibit that's been pre-marked as AA-2. Can you explain to the [c]ourt what that --- what that document is, please?

A. Yes. This was a memo from [] Hough, our Executive Director at the time, to [] Minnich, Secretary of Administration, Office of Administration, announcing plans to furlough, close two [g]ame [f]arms and furlough 13 people. And this was dated November 15, 2016.

R.R. at 71a. Clearly, this testimony does not satisfy the conditions of the hearsay rule exceptions for establishing that either document qualifies as a regularly conducted activity record or a public record. Accordingly, the SCSC properly determined that the documents were hearsay evidence.[4]

The Majority maintains that notwithstanding the above, Boyd corroborated the documents. Specifically, the Majority states: "Boyd testified, without contradiction, **from his own knowledge** about the cause of the Game Commission's lack of funds: **a decline in natural gas revenue** followed by the **General Assembly's refusal to approve a pheasant hunting license** or an increase in hunting license fees." Majority Op. at 16 (emphasis added). However, Boyd's testimony with respect to the decline in natural gas revenues came directly from the Game Commission Memo. Boyd testified:

---

[4] The only case wherein this Court accepted a memorandum as sufficient lack of funding evidence was *Sharp v. Department of Transportation*, 447 A.2d 1057 (Pa. Cmwlth. 1982). Therein, the issue of the memorandum's admissibility was raised based on hearsay, but the Court determined that the issue was waived as not properly preserved, and on that basis alone, declared it was permitted to consider it.

> Well, **the [Game Commission M]emo lays out our situation**. And at that time, aside from the strategic plan things that are discussed, **it talks about** an increase in our expenditures in terms of personnel costs due to healthcare and retirement contributions, but also **a reduction in revenue from Marcellus shale**.

R.R. at 67a-68a (emphasis added). Further, relative to the General Assembly's refusal to approve a pheasant hunting license or an increase in hunting license fees, Boyd was asked: "What does the [Furlough Notification Letter] say about the reasons for furloughs[?]" R.R. at 71a-72a. Boyd responded:

> Well, **it mentions the fact that we didn't get our license fee increase** in the last legislative session . . . . **It also mentions the fact** that we tried to generate some revenue related to the program. And that comes in the form of **a pheasant[-]hunting permit, which has never been in place before**.

R.R. at 72a (emphasis added). Clearly, Boyd did not testify from his personal knowledge, but rather what he learned from the Game Commission Memo and Furlough Notification Letter. Accordingly, Boyd did not corroborate either document.

Moreover, the SCSC expressly rejected Boyd's testimony which it had the right to do. "Questions of credibility and the weight to be accorded evidence are determined by the [SCSC], and this Court will not re-weigh the evidence or substitute its judgment even though it might have reached a different factual conclusion." *Thompson v. State Civil Serv. Comm'n*, 863 A.2d 180, 184 (Pa. Cmwlth. 2004). The SCSC opined:

> In short, the [Game Commission] has failed to establish that Boyd had any direct role in the actual decision to close the Northcentral Game Farm and furlough the employees, that he had direct knowledge of the insufficiency of the revenues as purported in the memoranda, or that he had personal knowledge of the relationship between the available funding and the furloughs that were conducted.

SCSC Adjudication at 14. The Majority engages in fact finding by stating otherwise, which is beyond this Court's authority.

The Majority next asserts that the SCSC erred by not addressing whether lack of work necessitated Wheeland's furlough. "[A]n appointing authority has demonstrated a lack of work when it establishes that: (1) the employee's position was eliminated; (2) reorganizational streamlining occurred; and (3) management in good faith believed that work could be accomplished more efficiently in the absence of the eliminated position." *Stover v. Dep't of Envtl. Res.*, 636 A.2d 1275, 1277 (Pa. Cmwlth. 1994).

The entirety of the Game Commission's lack of work evidence consisted of Boyd's testimony that two pheasant farms were closed, and Boyd's declaration:

> Q. Mr. Boyd, is it necessary to have additional Wildlife Maintenance Propagators in order to raise the chicks at the remaining farms?
>
> A. No. We're --- we're planning to make do with the existing staff at the Southwest and Loyalsock Game Farms.
>
> Q. And is there other work at the remaining farms that Wildlife Maintenance Propagators are needed to perform?
>
> A. Again, no unmet needs at this time.

R.R. at 73a-74a. In fact, Boyd never expressly testified that Wheeland was furloughed because the pheasant farm where Wheeland worked was closed. Moreover, when asked on cross-examination why people were still working at the closed farm where Wheeland worked, Boyd offered:

> A. There is work to be done, but the work is being met by the Loyalsock Game Farm staff. There's --- there will be some grass to be mowed. There will be some assets to be moved around and that sort of thing, but we don't really need extra staff to do that.

Q. That's --- that's not how you answered the question, though, is it? Didn't you say that there was no further work that needed to be done?

A. No. I said there was no unmet needs in terms of manpower.

R.R. at 75a-76a.

While not clearly articulated, the Game Commission's lack of work argument appears to be that because the farms were closed there is no work for the farms' employees. However, in *Silverman v. Department of Education*, 454 A.2d 185 (Pa. Cmwlth. 1982), the SCSC reasoned that because the employee's previous position had been abolished, the automatic consequence was a lack of work that justified his furlough. The *Silverman* Court in vacating the SCSC's adjudication explained:

> In [*Department of Public Welfare v.*] *Magrath,* [321 A.2d 403 (Pa. Cmwlth. 1974),] we upheld the elimination of a regular employee's position and his consequent furlough on the ground of lack of work. However, in *Magrath,* the elimination of the position *resulted from* the lack of work. In the instant case, the elimination of [the employee's] position *brought about* the lack of work in the position. Under the [SCSC's] reasoning, the mere elimination of a position would be enough to warrant the furloughing of a regular employee, regardless of whether or not there was an actual lack of work for people in the same class or status.

*Silverman*, 454 A.2d at 190. Similarly, in the instant case, since the closing of the farms led to the lack of work, this determination rests on whether the Game Commission presented reliable evidence to establish a *prima facie* case that there was a lack of funding to justify the closing of the farms.

> The Majority maintains:

> As Boyd fully explained, the Bureau of Wildlife Management has stopped breeding pheasants and, instead, is buying day-old chicks from a private vendor. The Game Commission closed the North Central and Western Game

Farms because they lacked the pen capacity to handle the purchased chicks. The Game Commission did not transfer Wheeland's work as a propagator to other employees.

Majority Op. at 18-19. Notwithstanding, even if Boyd had direct knowledge with respect to the choosing of which farms to close, without credible testimony of the lack of funds that required the closing of any farms, the evidence is insufficient to justify the lack of work furlough. As discussed above, the SCSC expressly rejected Boyd's testimony which it had the right to do.

Given that the Game Commission did not meet its burden of proving the lack of funding justification and no evidence was presented to establish the lack of work, the Dissent concludes that the Game Commission did not meet its burden of proving: "reorganizational streamlining occurred; and [] management in good faith believed that work could be accomplished more efficiently in the absence of the eliminated position." *Stover*, 636 A.2d at 1277. Accordingly, the SCSC properly concluded that the Game Commission did not prove a valid justification for the furlough.

The Dissent is in no manner discouraging the Commonwealth from streamlining its operations or saving money. Rather, the Dissent explains that the Game Commission, and any other administrative agency, is required to present sufficient, credible evidence, not merely rely on hearsay documents. The Dissent does not opine that the Game Commission did not have sufficient reasons to furlough its employees, but rather that the Game Commission failed to present credible, nonhearsay evidence to substantiate its actions. To rule to the contrary is not in accord with this Court's well-established precedent and even the more lenient evidentiary rules.

The Majority's position fosters a tremendous negative effect by allowing a governmental entity to prove its case solely through hearsay documentation that

contains no basis for its furlough decision beyond the fact that the decision was made. In this particular case, the Game Commission's failures are even more egregious in that it did not even establish that Wheeland worked at one of the two farms that were closed. This clearly is not the standard and this Court should not support the Game Commission's sloppiness as the new standard for proving lack of funding and/or lack of work. It is irrelevant whether the Game Commission had a legitimate basis for its decision. The question before the SCSC and this Court is whether the Game Commission presented the required minimal evidence to support its furlough decisions; it clearly did not do so.

For all of the above reasons, the Dissent would affirm the SCSC's order.


_____
ANNE E. COVEY, Judge




Judge McCullough and Judge Wojcik join in this dissenting opinion.